IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CRYSTAL L. ASHLEY, )
)
      Plaintiff, )
)
v. ) Civ. No. 11-192-SLR
)
BAYHEALTH MEDICAL CENTER, )
INC., )
)
      Defendant. )

Noel E. Primos, Esquire, William D. Fletcher, Jr., Esquire, and B. Brian Brittingham, Esquire of Schmittinger & Rodriguez, P.A., Dover, Delaware. Counsel for Plaintiff.

Richard J. King, Esquire and Joseph D. Shelby, Esquire of Stevens & Lee, P.C., Wilmington, Delaware. Counsel for Defendant.

**MEMORANDUM OPINION**

Dated: June 26, 2012
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

On March 7, 2011, Crystal L. Ashley ("plaintiff"), a registered nurse ("RN"), filed suit against her former employer, Bayhealth Medical Center ("defendant" or "Bayhealth"), alleging discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et. seq. (D.I. 1) Currently before the court is defendant's motion for summary judgment. (D.I. 23) The court has jurisdiction pursuant to 28 U.S.C. § 1331. For the reasons discussed below, the court grants defendant's motion.

## II. BACKGROUND

### A. Plaintiff's Employment with Defendant

Plaintiff, born March 12, 1967, is a forty-five year-old female RN. Defendant, a Delaware-based not-for-profit hospital system, hired plaintiff on July 17, 2000 to work at its Milford Memorial Hospital facility.[1] (D.I. 25 at 44) Originally, plaintiff worked full-time on a regular weekly schedule; in August of 2008, she transitioned into the role of a per diem relief status RN. (*Id.* at 45; D.I. 27 at 80-84) Relief status RNs do not have set hours; instead, their hours are contingent upon the staffing needs of Bayhealth. (D.I. 27 at 32) As a relief status RN, plaintiff ordinarily worked two or three times a week in either four or eight hour shifts. (*Id.* at 14)

Plaintiff's supervisor throughout the majority of her time at Bayhealth was Nurse Manger Susan Vanaman ("Vanaman") (born October 28,1954). (D.I. 25 at 44; D.I. 27

---

[1] Bayhealth also operates Kent General Hospital.

at 19) Employment evaluations from 2005 through 2009, signed by Vanaman, indicate that plaintiff "[met] expectations."[2] (D.I. 27 at 44-48)

Bayhealth employees are required to complete job-related continuing education requirements on an annual basis, although requirements vary according to vocation. (D.I. 25 at 45) Plaintiff completed numerous continuing education requirements during her tenure at Bayhealth. (D.I. 27 at 62-65) One mandatory class required of RNs was Blitz Education. Blitz Education consisted of two parts: the first part required RNs to review fourteen online modules, and the second involved the RNs demonstrating their competencies in those fourteen areas at skills validation stations. (D.I. 27 at 69)

### B. Circumstances Prompting Plaintiff's Resignation

Prior to 2010, Blitz Education requirements could be completed at several points throughout the year; however, in 2010, nursing executives at Bayhealth, and more specifically the director's council,[3] decided that Blitz Education classes would only be offered, and therefore needed to be completed, during an eight-week period from mid-March through mid-May. (D.I. 25 at 6-7; D.I. 27 at 35-36) The change was made to ensure that the hospital "complied with joint commission, state and nurse practice regulations." (D.I. 25 at 28) Failure to comply would result in termination, or the

---

[2] Plaintiff's work could have been "far above expectations," "above expectations," "[met] expectations," "below expectations," or "far below expectations." (D.I. 27 at 44-48)

[3] The council appears to be led by Bonnie Perratto, a senior vice president at Bayhealth and chief nurse executive, and comprised of the heads of all the nursing departments. (D.I. 25 at 28)

2

possibility of resignation with preferential rehiring status. (D.I. 27 at 25-26; 39) According to Bayhealth nursing executives, this change was widely publicized via the following means: flyers posted throughout the hospital; a post on the hospital's intranet; emails sent to employees;[4] and mentions at staff meetings. (D.I. 25 at 7; 21; 29) Nursing executives also testified that nurses who had not finished the required training near the deadline for completion were individually notified by their managers. (D.I. 27 at 38)

Despite efforts to inform the nursing staff of timing changes, plaintiff alleges that she was unaware that the Blitz Education courses would not be offered later in the year. (D.I. 27 at 7-8) Plaintiff explains that she was on vacation for part of the Blitz Education period, she was never specifically told about the timing changes by her superiors and she believed she had until July (the period in which she was annually reviewed) to complete continuing education requirements. (D.I. 26 at 5-6) She also notes that she had been tardy with education requirements in the past, and this shortcoming did not result in any discipline. (*Id.*)

Around May 31, 2010, nursing executives at Bayhealth reviewed continuing education records to see which nurses had failed to complete mandatory Blitz Education requirements. Vanaman's review revealed that plaintiff had completed at least part of the online half of the course but neglected to complete the hands-on, skills

---

[4] Plaintiff admitted not reading her work-related emails. (D.I. 27 at 14)

3

validation portion. (D.I. 27 at 62-63) As a result of this failure, Vanaman was required to terminate plaintiff. (D.I. 27 at 39)

Plaintiff and defendant have different recollections of how the resignation occurred. According to defendant, Vanaman called plaintiff on June 2nd and initially inquired as to whether plaintiff had simply forgotten to turn in the paperwork evidencing her completion of Blitz Education. (D.I. 25 at 9) Plaintiff acknowledged not completing the requisite training. (*Id.*) In the wake of this acknowledgment, Vanaman asked plaintiff to meet with her to discuss disciplinary consequences; Vanaman acknowledged that termination was a possibility. (*Id.* at 10) According to Vanaman, she never met with plaintiff because plaintiff called her back that same day and said that she "wasn't going to drive all that way just to be fired." (*Id.*) At that time, Vanaman mentioned that resignation would be an alternative. (*Id.*)

Plaintiff recalls Vanaman calling on June 2nd. (D.I. 27 at 6) According to plaintiff, Vanaman initially asked her to come in before her June 4th shift for a meeting; plaintiff claims to have readily agreed unaware of the purpose of the meeting. (*Id.*) Plaintiff claims that Vanaman called her back later in the day and admitted that the meeting would result in her termination for failure to complete the Blitz Education requirement. (*Id.*) She also notes that Vanaman indicated that resignation with preferential rehiring status would be an option. (*Id.*)

Both sides acknowledge that plaintiff ultimately did send in a resignation letter. (D.I. 25 at 11) At the time of this resignation, plaintiff was forty-three years old.

4

Plaintiff has identified, and produced to the court, defendant's internal policy on continuing education requirements. According to the policy, dated October 5, 2010, education requirements fall into two categories, mandatory and voluntary, with mandatory education requirements being "those educational offerings for which employees are required to attend as a condition of employment." (D.I. 27 at 71) Under the policy's "corrective action" section, failure to complete mandatory education would result in "progressive disciplinary action," with suspension without pay being the first method of discipline for non-compliance. (*Id.* at 74) The record reveals that nursing executives at Bayhealth opted not to follow the progressive disciplinary structure set forth in this policy. (D.I. 27 at 39)

### C. Plaintiff's Explanation for Why She Believes Age Prompted Her Forced Resignation

In an attempt to understand the reasons why plaintiff believed age prompted her forced resignation, the following exchange occurred between plaintiff and opposing counsel at plaintiff's deposition:

> Q: Can you explain for me how you think [your termination was ] pretextual?
> . . .
>
> A: Well, I have been a staff member [at Bayhealth] for over ten years, and I just couldn't understand why they would terminate me or force me to resign because of one missed class out of hundreds. It really didn't make any sense to me. And I had also heard, you know, stories of [construction of another wing at Milford Memorial Hospital]. And I just could not understand. There had to be some other reason why they would do such a thing.
> And after a careful review, I really just didn't believe the reason I was terminated or forced to resign was because I missed one class. And at the time I didn't know that. But since that time, I have learned

5

> that most of the employees that [were terminated or forced to resign] were over the age of 40, that all these new nurses were hired, and in addition to that, that they were going to be knocking down Milford hospital and rebuilding. . . . And they were possibly doing away with all the older nurses that were, you know, making more money. I just couldn't understand.
>
> . . .
>
> So therefore, I didn't believe I would be terminated for missing one class out of hundreds. I mean I have to keep my nursing licence, continuing education, CPR, and other classes, as well. And so I just -- I believe there is another reason besides that I missed that class.
>
> . . .
>
> Q: You said there has to be some other reason. Why does that reason have to be your age?
>
> A: Because almost all the employees that were terminated were over the age of 40.
>
> Q: How do you know that?
>
> A: All the ones that I know, that I'm aware of are over the age of 40.
>
> . . .
>
> Q: Okay. Is there any other reason why you think [your termination] was based on your age?
>
> . . .
>
> A: No, just by that evidence.
>
> Q: That evidence, being the people that you know?
>
> A: Yes. Everyone that I was aware of [who was terminated or forced to resign] was over the age of 40.

(D.I. 27 at 7-8)

### D. Bayhealth Nursing Demographics

Bayhealth hired fifty-three nurses in 2010. The average age of the nurses hired during that time frame was 40.9 years and the average age of those nurses hired prior

6

to the June Blitz Education layoffs was 42. (D.I. 25 at 44)

Forty Bayhealth nurses failed to complete the Blitz Education requirement; eighteen of those nurses worked at Milford Memorial and the other twenty-two worked at Kent General. (D.I. 27 at 76-77) The average age of those affected was 40.4 years of age; more specifically, the average age of Milford Memorial nurses affected was 45.6[5] and the average age of Kent General nurses was 36.3.[6] (*Id.*)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come

---

[5] The individual ages were: 22, 43, 51, 63, 54, 72, 31, 50, 54, 39, 27, 60, 57, 30, 27, 57, 41, and 42.

[6] The individual ages were: 49, 31, 36, 33, 31, 43, 27, 51, 41, 42 40, 34, 56, 24, 24, 40, 41, 22, 23, 30, 40, and 41.

7

forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

### A. ADEA Standard

Under the ADEA, it is unlawful for an employer:

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or

(3) to reduce the wage rate of any employee in order to comply with this chapter.

29 U.S.C.A. § 623. The prohibitions of the ADEA are "limited to individuals who are at least 40 years of age." 29 U.S.C.A. § 631. In order to recover under a disparate

treatment theory, a plaintiff "must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 180 (U.S. 2009).[7]

The parties agree that the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) is applicable to plaintiff's claim of disparate treatment.[8] (D.I. 24 at 9; D.I. 26 at 10) Under this framework, plaintiff must

---

[7] While *Gross v. FBL Financial Services* cast doubt on the applicability of *McDonnell Douglass* in the context of ADEA claims, the Third Circuit has endorsed the continued use of the framework. *See Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009); *Mayk v. Reading Eagle Co.*, Civ. A. No. 08-4866, 2010 WL 1141266, at *4 (E.D. Pa. Mar. 24, 2010) ("In a recent case published after *Gross,* the Third Circuit Court of Appeals recognized that *Gross* expressed significant doubt about any burden-shifting under the ADEA, but concluded that the 'but-for causation standard' required by *Gross* did not conflict with the continued application of the *McDonnell Douglas* paradigm in age discrimination cases: *Gross* stands for the proposition that it is improper to shift the burden of persuasion to the defendant in an age discrimination case. *McDonnell Douglas,* however, imposes no shift in that particular burden. . . . Hence, *Gross,* which prohibits shifting the burden of persuasion to an ADEA defendant, does not forbid our adherence to precedent applying *McDonnell Douglas* to age discrimination claims.").

[8] "In contrast to a claim of disparate treatment, a claim of disparate impact requires no inquiry into the employer's intent. Rather, the court examines the **consequences** of employment practices, not simply the motivation. For this reason, the focus in a disparate impact case is usually on statistical disparities, rather than specific incidents, and on competing explanations for those disparities. Despite these differences however, disparate impact cases [also] employ a burden shifting analysis. . . . To establish a prima facie case of age discrimination under the disparate impact theory, the plaintiff must show that the employer's selection process results in unfavorable treatment of a disproportionate number of members of the protected group to which the plaintiff belongs." *Finch v. Hercules Inc.*, 865 F. Supp. 1104, 1122 (D. Del. 1994) (citation and quotations omitted) (emphasis in original). As discussed more fully below, while much of the evidence offered by plaintiff concerns an employment practice and statistical evidence, because the parties proceed on a disparate treatment theory throughout their briefs, the court does the same. The employer's intent will remain the court's focus.

9

first present a prima facie case of age discrimination. "In order to establish a prima facie case of [age] discrimination, the plaintiff must demonstrate that (1) s/he is over forty, (2) is qualified for the position in question, (3) suffered from an adverse employment decision, and (4) that his or her replacement was sufficiently younger to permit a reasonable inference of age discrimination." *Potence v. Hazleton Area School Dist.*, 357 F.3d 366, 370 (3d Cir. 2004) (citing *Duffy v. Paper Magic Group, Inc.*, 265 F.3d 163, 167 (3d Cir. 2001)).

While the above-stated prima facie case is ordinarily applicable to ADEA claims, rigid adherence to specific prima facie cases has been eschewed by the United States Supreme Court and the Third Circuit. *McDonnell Douglas*, 411 U.S. at 803, n.13 ("[T]he specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations"); *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 365 (3d Cir. 2008) (quoting *Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 581 (3d Cir. 1996)) ("We have cautioned that 'the elements of that **prima facie** case must not be applied woodenly, but must rather be tailored flexibly to fit the circumstances of each type of illegal discrimination.'"). Accordingly, "the precise elements of a plaintiff's prima facie case may vary with the particular circumstances" of a case. *Waldron v. SL Industries, Inc.*, 56 F.3d 491, 494 (3d Cir. 1995). As the Third Circuit succinctly explained in *E.E.O.C. v. Metal Service Co.*, 892 F.2d 341, 348 (3d Cir. 1990), "since the importance of *McDonnell Douglas* lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII [or ADEA] plaintiff must carry the initial burden of offering evidence

10

adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act, . . . courts need not, and should not, stubbornly analyze all Title VII [and ADEA] factual scenarios through the *McDonnell Douglas* formula." (citations and quotations omitted).

In the present case, because there is no suggestion that plaintiff was replaced by a younger employee, a more generic fourth element is appropriate. Specifically, "a showing that the circumstances of the adverse employment action gives rise to an inference of age discrimination would be sufficient to satisfy the fourth element of a prima facie case." *Mayk*, 2010 WL 1141266, at *6; *Mowafy v. Noramco of Delaware, Inc.*, 620 F. Supp. 2d 603, 612 (D. Del. 2009) (quoting *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410-11 (3d Cir.1999)) ("The fourth element is often stated in more general terms as a requirement that the 'adverse employment action occurred under circumstances that give rise to an inference of intentional discrimination.'"). A "[c]ommon circumstance[] giving rise to an inference of unlawful discrimination . . . [is] the more favorable treatment of similarly situated colleagues outside of the relevant class." *Bullock v. Children's Hosp. of Phila.*, 71 F. Supp. 2d 482, 487 (E.D. Pa. 1999). Ultimately, "[p]laintiff's 'evidentiary burden at [the prima facie] stage is rather modest: it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent - i.e., that discrimination could be a reason for the employer's action." *Gude v. Rockford Center Inc.*, 699 F. Supp. 2d 671, 679 (D. Del. 2010) (quoting *Marzano v. Computer Sci. Corp. Inc.*, 91 F.3d 497, 508 (3d Cir. 1996)).

Assuming a prima facie case has been established,[9] the burden then shifts to defendant to produce "a legitimate, non-discriminatory reason for the adverse employment action" it undertook with respect to the plaintiff. *Smith*, 589 F.3d at 691. A defendant-employer satisfies this "relatively light" burden of production by "introducing evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision. The employer need not prove that the tendered reason actually motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Fuentes v. Perkasie*, 32 F.3d 759, 763 (3d Cir. 1994).

If defendant meets its burden of production at the second stage of the *McDonnell Douglas* tripartite framework, the burden then shifts back to the plaintiff. At this last stage, "the court focuses on whether there is sufficient evidence from which a jury could conclude that the purported reasons for defendant's adverse employment actions were in actuality a pretext for intentional [age] discrimination." *Jones*, 198 F.3d at 412. While, at trial, a plaintiff must prove by a preponderance of the evidence that defendant's proffered non-discriminatory reason was false (i.e. pretextual) and age was the but-for cause of the adverse action, to survive a motion for summary judgment, a plaintiff need only "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not

---

[9] Failure to make out a prima facie case will result in a judgment for the defendant. *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (3d Cir. 1999).

a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 763; *Jones*, 198 F.3d at 413. The court refers to this two-pronged test as the *Fuentes* test. Under prong one of the *Fuentes* test,

> the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence.

*Fuentes*, 32 F.3d at 765 (internal quotations and citations omitted). In simpler terms, "a plaintiff may satisfy this standard by demonstrating, through admissible evidence, that the employer's articulated reason was not merely wrong, but that it was 'so plainly wrong that it cannot have been the employer's real reason.'" *Jones*, 198 F.3d at 413 (quoting *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3rd Cir. 1997)). Generally, cases analyzed under this prong survive summary judgment "when the employer's stated reason for termination is so implausible that a reasonable fact-finder could not believe it." *Connolly v. Pepsi Bottling Group, L.L.C.*, Civ. No. 06-1462, 2008 WL 4412090, at *9 (W.D. Pa. Sept. 22, 2008). Under prong two of the *Fuentes* test, in order to show that a discriminatory reason was more likely than not a motivating or determinative cause of the employer's action, a plaintiff may rely on three types of evidence: (1) previous discrimination against the plaintiff; (2) discrimination by the employer against other persons; and (3) whether an employer has treated other similarly situated employees not within the protected class more favorably. *Id.* at *11;

*Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3rd Cir. 1998).

### B. Analysis

#### 1. The prima facie case

Defendant concedes, for arguments sake, that elements one, two and three of the prima facie case can be established; it is the fourth element that defendant contests in its motion. (D.I. 24 at 10) While defendant asserts that plaintiff must prove that similarly situated employees outside of the protected class were treated more favorably (*id.* at 11), plaintiff is only required to show that the circumstances of the adverse employment action gives rise to an inference of age discrimination. *See supra*, pg. 11. Of course, favorable treatment of younger nurses that also failed to complete Blitz Education would suggest that plaintiff was discriminated against on the basis of her age.

In an attempt to demonstrate how age prompted her forced resignation, plaintiff makes two arguments. First, plaintiff contends that defendant's "hasty" scheduling change and insufficient notification regarding Blitz Education requirements had the effect of leaving plaintiff, and other older employees, "confused and unaware." (D.I. 26 at 12-14) In other words, the changes were designed to result in the termination of the older and more established nurses. Second, plaintiff points the court to statistical evidence, namely evidence on the ages of those employees who were terminated, which included several nurses over the age of forty.[10] (*Id.* at 14)

---

[10] *See supra*, n.8, pg. 9.

14

The court recognizes that the burden of establishing a prima facie case is not onerous; nevertheless, the court concludes that plaintiff has failed to produce evidence compatible with discriminatory intent. Even assuming the change to the Blitz Education requirements was "hasty," there is no indication that defendant specifically sought to terminate plaintiff because of her age. Indeed, the statistical evidence does not suggest that older employees were systematically targeted. While several employees over the age of forty were terminated or forced to resign for failure to complete Blitz Education, several individuals under the age of forty were also affected. In total, forty percent of the affected workforce was under forty years of age.

Furthermore, an examination of similarity situated individuals outside of the protected class belies the argument that age prompted plaintiff's forced resignation. Nurses under the age of forty who failed to complete Blitz Education were also terminated or forced to resign. The court has not been directed to any evidence suggesting that younger employees were given preferential treatment after failing to complete their mandatory Blitz Education requirements.

In short, a hasty change that detrimentally affected significant numbers of both old and young employees does not give rise to an inference that plaintiff was terminated because of her age. This is especially true in light of the fact that the average age of nurses hired by defendant in 2010 was over the age of forty.

### 2. Pretext

Plaintiff does not specifically identify which prong or prongs of the *Fuentes* test she is relying on to undermine defendant's legitimate non-discriminatory reason for

termination. Plaintiff's brief, however, sets forth a litany of reasons why she believes her termination was pretextual, including: 1) defendant's failure to provide a "clear, articulate [and] intelligent" reason for carrying out the forty terminations; 2) plaintiff ordinarily had until July to complete her continuing education requirements; 3) defendant ignored its official (progressive disciplinary action) and unofficial (allowing employees to complete education requirements in a tardy fashion without consequence) continuing education policies; 4) the terminations created problematic staffing shortages; 5) plaintiff's termination resulted from a failure to attend a single minor continuing education requirement despite years of productive employment; 6) the changes to the Blitz Education program were not clearly and effectively communicated to plaintiff; 7) plaintiff heard that "most of the nurses terminated or forced to resign from Milford Memorial were over 40 years old." (D.I. 26 at 15-19)

Aside from the last reason, plaintiff's arguments appear directed at prong one of the *Fuentes* test; in other words, plaintiff is arguing that the legitimate non-discriminatory reason for her termination (i.e., her failure to complete the mandatory Blitz Education requirements) is so implausible that a reasonable fact-finder could not believe it. The court disagrees. There is no dispute that plaintiff, along with numerous others, failed to complete the Blitz Education requirements that defendant altered in order to ensure compliance with applicable regulations. Terminations and forced resignations resulted from these failures. Plaintiff's termination for failure to attend is not made implausible by the fact that defendant ignored previous customs and policies

in order to ensure regulatory compliance.[11] Nor is it made implausible by the fact that it created staffing concerns and eliminated a productive employee who may not have appreciated the consequences of her failure to timely complete Blitz Education. In reaching this conclusion, the court is mindful of the fact that it has not been tasked with acting as an "arbital board [that rules] on the strength of the 'cause' for the [adverse employment action]." *Kemp v. Del Monte Foods*, Civ. No. 02:04cv1731, 2007 WL 2254678, at *6 (W.D. Pa. Aug. 6, 2007) (quoting *Keller*, 130 F.3d at 1109). "No matter how medieval a [business's] practices, no matter how high-handed its decisional process, no matter how mistaken the [business's] managers," the ADEA has not transformed courts into "super-personnel department[s] that reexamine[] entities' business decisions." *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 332 (3d Cir. 1995) (quoting *McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 373 (7th Cir. 1992)). In short, the court is not concerned with whether an employer is wise, shrewd, prudent or even competent; the ultimate inquiry remains whether discriminatory animus motivated the employer's decision. *Fuentes*, 32 F.3d at 765. On the facts set forth by plaintiff, the court does not find sufficient evidence from which a reasonable jury could conclude that the purported reasons for defendant's decision to terminate plaintiff were in actuality a pretext for intentional age discrimination.

The court's conclusion is not altered by defendant's last reason, i.e. that "most of

---

[11] While disregard for a written internal policy is certainly atypical, it does not make defendant's reason for termination suggestive of discrimination when the terminations were carried out in a uniform fashion regardless of age.

17

the nurses terminated or forced to resign from Milford Memorial were over 40 years old." This reason appears focused on prong two of the *Fuentes* test; in other words, plaintiff appears to argue that defendant has discriminated against other employees. However, as discussed above, significant numbers of young and old employees were terminated for failure to complete their Blitz Education requirements and similarly situated nurses outside of the protected class were not treated any more favorably than plaintiff.

## V. CONCLUSION

For the reasons discussed above, defendant's motion for summary judgment is granted. An appropriate order shall issue.